**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**ASHLAND**

**Civil Action No. 05-38-DLB**

**TIMOTHY ALLEN MORRISON, II, by and through his next friends,**
**TIMOTHY MORRISON and MARY MORRISON,**
**TIMOTHY and MARY MORRISON,**
**BRIAN NOLEN and DEBORA JONES,**                                     **PLAINTIFFS,**

**v.**                          **MEMORANDUM OPINION AND ORDER**

**BOARD OF EDUCATION OF BOYD COUNTY, KENTUCKY,**          **DEFENDANT,**

**SARAH ALCORN, WILLIAM CARTER,**
**DAVID FANNIN, LIBBY FUGETT,**
**TYLER McCLELLAND and JANE DOE,**               **INTERVENOR-DEFENDANTS.**

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court upon the parties' cross motions for summary judgment [Docket Nos. 48, 49 and 50]. The motions have been fully briefed by the parties and this matter is now ripe for decision.

**I.      FACTUAL BACKGROUND**

This matter was borne of another lawsuit, *Boyd County High School Gay Straight Alliance, et al. v. Board of Education of Boyd County, et al.* 03-CI-17-DLB, wherein a group of Boyd County High School students sought to enjoin the defendants from denying their organization, the Boyd County High School Gay Straight Alliance, club status.

Following the issuance of a preliminary injunction, the parties in that case entered into a Consent Decree which required, among other things, that the school put into effect written anti-harassment policies and conduct mandatory staff and student diversity training, a significant portion of which would be devoted to issues of sexual orientation and gender harassment.

Subsequently, the defendant Board of Education of Boyd County, Kentucky (hereinafter "the Board") incorporated written policies into the Middle School and High School Codes of Conduct, which provide, in relevant part:

HARASSMENT / HATE CRIMES (Refer to Harassment Section)

> Harassment/discrimination is intimation by threats of or actual physical violence; the creation by whatever means, of a climate of hostility or intimidation, or the use of language, conduct, or symbols in such a manner as to be commonly understood to convey hatred, contempt or prejudice or have the effect of insulting or stigmatizing an individual.

> CONSEQUENCE -
> Conference with School Administrator and written documentation about harassment act. Students involve may also be included in initial conference. One (1) to Five (5) days suspension, Court Referral and local law enforcement agency notified.

The "Harassment Section" is a separate policy, which provides, in relevant part:

Policy 09.42811 - Harassment / Discrimination

> Harassment / Discrimination is unlawful behavior based on race, color, national origin, age, religion, sex, actual or perceived sexual orientation or gender identity, or disability that is sufficiently severe, pervasive or objectively offensive that it adversely affects a student's education or creates a hostile or abusive educational environment.

> The provisions in this policy shall not be interpreted as applying to speech otherwise protected under the state or federal constitutions where the speech does not otherwise materially or substantially disrupt the educational process, as defined by policy 09.426, or where it does not violate provisions of policy 09.422.

2

Just prior to the start of the 2004-2005 school year, the Board conducted the staff training.   In early November 2004, the Board conducted the student training  at both Boyd County Middle School and Boyd County High School .  Pursuant to the Consent Decree's mandate that the training be age appropriate, two versions of the video were produced, for the middle school and high school, respectively.  The versions differ only slightly in content. Both training sessions consisted of a one hour video and comments from an instructor. After the video, students were given comment cards as well as the opportunity to ask questions.   The training was, as contemplated by the Consent Decree, mandatory and the failure to attend would result in an unexcused absence.

The record reveals that prior to the student training,  the parents of several students, including the Plaintiffs, submitted "opt out" notices to the schools and their children, including student-Plaintiff,  did not participate in the training.  The record further shows that those students received an unexcused absence.

On February 15, 2005, Plaintiffs filed the instant action alleging that the school's polices and practices violate their constitutional rights of free speech, equal protection, and free exercise as well as their  right to direct the ideological and religious upbringing of their children.  Specifically, Plaintiffs state that they have sincerely held religious beliefs that homosexuality is harmful to those who practice it and harmful to society as a whole.  They further believe that homosexuality is not an immutable characteristic.   They state that because they must love and care for others, they must inform those who are engaged in a destructive lifestyle that they are wrong and that they are engaging in behavior that is harmful not only to themselves, but to society as a whole.  However, Plaintiffs allege that they are prohibited from conveying their views on homosexuality by virtue of the Boards's

policies and practices.  Plaintiffs seek a declaration that the Board's  policies and practices are unconstitutional and, further, seek to permanently enjoin Defendants from implementing the same.

The plaintiffs from the prior lawsuit moved to intervene in the this case in order to protect their rights as parties to the aforementioned Consent Decree [Docket No. 11].  This Court permitted the intervention [Docket No. 19].

The Court presided over a prolonged mediation in this matter during which revisions were made to the Board's written policies.  The revisions have been filed of record and are set forth in the attachments to Docket No. 63.

Ultimately, the Court ordered the parties to file cross motions for summary judgment [Docket No. 43].

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to the parties' case and on which that party will bear the burden of proof at trial.  In such a situation there can be no "genuine issue as to any material fact" as a complete failure of proof concerning an essential element of the non-moving parties' case "renders all other facts immaterial." *Bauer v. Montgomery*, 215 F.3d 656 (6th Cir. 2000), citing *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).

4

**III.     ANALYSIS**

**A.     First Amendment**

Plaintiffs allege that the policies and practices of the Board, as embodied in the Codes of Conduct as well as the Fall 2004 training, impinge upon their rights to freedom of speech.

It is well settled that students do not shed their First Amendment rights at the schoolhouse gate. *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 509 (1969). However, the First Amendment freedom accorded to students must be viewed "in light of the special characteristics of the school environment." *Id.* at 506. The constitutionality of speech, or  regulations of the same, in public schools turns on the identity of the speaker and whether the school is the sponsor, or simply the setting, of the speech.  To that end, there are three categories of speech in the school context: government speech, school-sponsored speech, and student speech. Each category enjoys a different degree of First Amendment protection.

The private, noncurricular speech of students is entitled to almost blanket constitutional protection.  A school may restrict only student speech which "materially and substantially interfere[s] with the requirements of appropriate discipline in the operation of school" or "impinge[s] upon the rights of other students. *Tinker* at 509.  Further limiting the restriction of speech is the requirement that the there be a specific fear of significant disruption.  The *Tinker* Court admonished that an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* at 508.

As a general matter, government speech - speech by the school itself - too, is given

5

a certain amount of latitude in that it need not be neutral, so long as the speech does not run afoul the Establishment Clause or the Equal Protection Clause. *See e.g. Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819 (1995).

Private expression which is, or reasonably perceived to be, sponsored by the school, such as writings in a school newspaper, is to be examined by the guidelines set forth in *Hazlewood School District v. Kuhlmeier*, 484 U.S. 260 (1988) in which the Supreme Court held that a school may regulate or otherwise edit student speech which is "inconsistent with its basic educational mission" so long as the regulation is "reasonably related to legitimate pedagogical concerns." *Id.* at 266 and 273. The holding in *Hazlewood* reflects the practical need of authorizing educators to exercise some degree of control on speech bearing the school's imprimatur.

### 1.  Written Policies

With regard to the written policies set forth in the Codes of Conduct, the parties agree that *Tinker* governs. Plaintiffs and Intervenor-Defendants contend that policies in effect for the 2004-2005 school year suffer from constitutional infirmities in light of *Tinker* as well as problems of overbreadth and vagueness. During the mediation in this matter, the parties exchanged various versions of the policies in order to cure the alleged defects. Ultimately, revisions were agreed upon and adopted by the Board in August 2005.

The United States Supreme has repeatedly and consistently cautioned lower courts to avoid adjudicating constitutional issues where possible. *See United States v. National Treasury Employee's Union*, 513 U.S. 454, 478 (1995) (noting a "policy of avoiding unnecessary adjudication of constitutional issues). *See also Bowman v. Tennessee Valley Authority*, 744 F.2d 1207, 1211 (6th Cir., 1984) ("If we are able to decide this appeal on non-

6

constitutional grounds we will do so and will not reach the First and Fifth Amendment issues.").

In their current form, the written policies are consistent with *Tinker* and its progeny. Following the high court's directive, this Court is not inclined to adjudge the constitutionality of policies no longer in effect.

## 2. Student Training

Plaintiffs urge that the Fall 2004 student training impinged upon their First Amendment rights as well.[1]   Plaintiffs maintain that while the training is replete with positive statements regarding homosexuality, critical or negative statements are prohibited. Plaintiffs argue that such viewpoint discrimination is unconstitutional.[2]   However, Plaintiff' claim fails on both the law and the facts.

In support of their argument, Plaintiffs rely upon *Hansen v. Ann Arbor Public Schools*, 293 F.Supp.2d 780 (E.D. Mich. 2003).  In *Hansen*, a high school student was not permitted to speak at a school assembly because she intended to express her view that homosexuality was a sin.  In finding that the school had violated the student-plaintiff's First Amendment rights, the District Court ruled that the school had engaged in viewpoint discrimination without articulating a legitimate pedagogical reason for doing so[3].

---

[1]  The script of the training  includes references to the written policies.  As discussed above, those policies have been revised and the revisions incorporated into the script.  Therefore, those portions of the script meet the prevailing constitutional standards and will not be discussed in this opinion.

[2]  Discovery exchanged between the parties establishes that the Plaintiffs object to language contained on pages 22-23 and 24-26 of the script of the Middle School video and pages 29-30 and 32-33 of the script of the High School video.

[3]  There appears to be a disagreement amongst the circuits as to whether school-sponsored speech must be viewpoint neutral.  However, this Court need not add to the splintered

*Hansen*, however, is inapposite to the instant matter.   The intended speech in *Hansen* was by a student, at an assembly scheduled by the school for the purpose of discussing diversity.   Students had been invited to participate in a panel discussion. Therefore, at issue in *Hansen* was school-sponsored speech, whereas the subject video is speech by the school, or, government speech.  Thus, different constitutional standards apply.

In the instant case, the student training is speech by the school and, as such, need not be neutral so long as the viewpoint or content is reasonably related to legitimate pedagogical concerns.  *See Hazlewood School District v. Kuhlmeier*, 484 U.S. 260, 273 (1988).   Yet, the Court, having reviewed the training materials for both the Middle School and High School sessions, finds them to be viewpoint neutral.[4]  Absent from both versions of the training is favorable treatment for any particular viewpoint or elevation of one opinion over the other.

 Further, with regard to Plaintiffs' claim that their speech was prohibited, there is no evidence in the record that any speech was actually censored.   Discovery revealed that the student-Plaintiff did not watch the training video or otherwise participate in the student training.  Although Plaintiffs claim that another student, Jordan Delveccio, was improperly punished for objecting to or during the training, they have failed to produce any specific evidence in support of this allegation.

---

jurisprudence as this case does not involve school-sponsored speech.

[4]  The Court's finding as to the viewpoint neutrality of the training materials has no bearing upon the issue of whether the Fall 2004 student training was in compliance with the Consent Decree.

Moreover,  following the video, students are given blank cards on which they are asked to comment on the training.  The opportunity to speak with regard to the training, without parameters, and with no threat of punishment, belies Plaintiffs cry of chilling effect. Had the student-Plaintiff attended the training, he would have been given the chance to express his views.   Indeed, one such comment card read: "I agree with the fact that no one should be harassed, but I am a Christian.  I am a firm believer in Romans where it says that unnatural attraction is wrong.  I would never harass a homosexual student.  Although I do not approve at all of what they do.  Homosexuality is a sin and that is my belief, but it is wrong to harass or bully anyone."

The only restrictions on speech expressed in the training materials pertain to potential student speech and are in line with *Tinker* in that harassing speech which disrupts the educational process will not be tolerated.

Based upon the record before the Court, there is simply no basis for Plaintiffs' First Amendment free speech claim.

**B.**     **Free Exercise**

Attendant to their freedom of speech claim is the Plaintiffs' assertion that the Defendants burdened the free exercise of their religion.   Plaintiffs' claim that the Board violated the Free Exercise Clause of the First Amendment by requiring attendance at the student training, which they contend not only presented, but promoted values contrary to their religious beliefs.  Plaintiffs further claim that the Board attempted to change the student-Plaintiff's religious and ideological views regarding homosexuality.

Similarly in *Mozert v. Hawkins County Board of Education*, 827 F.2d 1058 (6th Cir. 1987), a group of students and their parents mounted a free exercise challenge to the use

of a set of textbooks which contained views contrary to their religious beliefs.   The Court of Appeals for the Sixth Circuit found that the use of the textbooks in question in the required reading curriculum did not run afoul the free exercise clause.  The Court reasoned that "the requirement that students read the assigned materials and attend reading classes, and the absence of a showing that this participation entailed affirmation or denial of a religious belief, or performance or non-performance of a religious exercise or practice, does not place an unconstitutional burden on the students' free exercise of religion." *Mozert* at 1065.

Following *Mozert*, it is not enough that Plaintiffs' claim that the mandatory student training offends their religious beliefs.  They must establish that it created a burden upon the exercise of their religion.  Again, Plaintiffs' claim falls short.  There is no evidence that the student-Plaintiff, or any other student, was compelled to disavow his or her religious beliefs.   Nor is there evidence that the student-Plaintiff, or any other student, was called upon to endorse homosexuality, bisexuality or transgendered persons.

This case is a far cry from *Citizens for a Responsible Curriculum* v. *Montgomery County Public Schools*, 2005 WL 1075634 (D.Mich. 2005) which involved a dispute over the discussion of homosexuality as part of the   health education curriculum in the defendant's school system.  Included in the curriculum was a "Myths and Facts" handout which included a section entitled "Morality" which purported to address certain attitudes regarding homosexuality, e.g. "homosexuals are sick," "it isn't 'normal' to be homosexual." *Citizens for a Responsible Curriculum*. at *3-5.   The "Morality" section included   the following:

Myth: Homosexuality is a sin.

10

Facts: The Bible contains six passages which condemn homosexual behavior. The Bible also contains numerous passages condemning heterosexual behavior. Theologians and Biblical scholars continue to differ on many Biblical interpretations. They agree on one thing, however. Jesus said absolutely nothing at all about homosexuality. Among the many things deemed an abomination are adultery, incest, wearing clothing made from more than one kind of fiber, and eating shellfish, like shrimp and lobster. Religion has often been misused to justify hatred and oppression. Less than a half a century ago, Baptist churches (among others) in this country defended racial segregation on the basis that it was condoned by the Bible. Early Christians were not hostile to homosexuals. Intolerance became the dominant attitude only after the Twelfth Century. Today, many people no longer tolerate generalizations about homosexuality as pathology or sin. Few would condemn heterosexuality as immoral--despite the high incidence of rape, incest, child abuse, adultery, family violence, promiscuity, and venereal disease among heterosexuals. Fortunately, many within organized religions are beginning to address the homophobia of the church. The Nation Council of Churches of Christ, the Union of American Hebrew Congregations, the Unitarian Universalist Association, the Society of Friends (Quakers), and the Universal Fellowship of Metropolitan Community Churches support full civil rights for gay men and lesbians, as they do for everyone else.

In addition, the curriculum contained statements which seemed to elevate certain religious views over others. For example, the Court found that "the Revised Curriculum plainly portrays Baptist churches as willingness expressing the same intolerance attitude towards homosexuals today as they did towards African Americans during segregation." *Citizens for a Responsible Curriculum.* at *11. The Court was "extremely troubled by the willingness of [d]efendants to venture - or perhaps more correctly bound into the crossroads of controversy where religion, morality and homosexuality converge." *Id.* Ironically, this case was cited to, and a copy provided to, the Court by the Plaintiffs in their Response to Cross Motions for Summary Judgment [Docket No. 56].

Unlike the curriculum in *Citizens for a Responsible Curriculum* v. *Montgomery County Public Schools*, the subject student training labors hard to dissociate itself from a particular view and leaves religion to the students and their families. At the end of the

11

videos shown to both the Middle School and High School students, the Compliance Coordinator makes the following statement:

> We would never try to influence (your religious beliefs). They are very sacred and they should only be influenced by you, your parents and your family. Please realize that with the video we showed today we are only trying to instill a sense of honor amongst our students to learn not to treat someone unfairly or harass someone because they are different.

Based upon the record before the Court, the inculcation alleged by Plaintffs simply does not exist. Plaintiffs have failed to demonstrate a burden upon their free exercise rights.

## C.    Parental Rights

Plaintiffs assert that compulsory attendance at the training impedes upon their right, as parents, to direct the ideological and religious upbringing of their children.

As the Sixth Circuit recently reiterated, "[w]hile parents may have a fundamental right to decide *whether* to send their child to a public school, they do not have a right generally to direct *how* a public school teaches their child." *Blau v. Fort Thomas Public School District*, 401 F.3d 381, 395 (6th Cir. 2005).

Of particular import to this case is *Brown v. Hot, Sexy and Safer Productions, Inc.*, 68 F.3d 525 (1st Cir. 1995), in which a group of public high school students and their parents claimed that a mandatory school assembly aimed at educating students on AIDS and other health concerns violated the parents' "fundamental right to direct the upbringing of their children and educate them in accord with their own views." *Brown* at 532. Plaintiffs alleged, *inter alia*, that the program, staged and conducted by the Defendant, included sexually explicit dialogue, "advocated and approved oral sex, masturbation, homosexual activity and condom use during promiscuous premarital sex", and that several

12

minors chosen from the audience participated in "sexually suggestive skits."  *Brown* at 529.

The parent-plaintiffs also claim that they were not given advance notice of the content of

the program or an opportunity to excuse their children from the same.  *Brown* at 530.   The

district court dismissed the complaint for failure to state a claim upon which relief could be

granted.  The First Circuit affirmed the district court's dismissal and specifically refused to

recognize a fundamental right to dictate curriculum.       Cautioning against such

micromanagement, the Court stated:

> We think it is fundamentally different for the state to say to a parent, "You
> can't teach your child German or send him to a parochial school," than for the
> parent to say to the state, "You can't teach my child subjects that are morally
> offensive to me." The first instance involves the state proscribing parents
> from educating their children, while the second involves parents prescribing
> what the state shall teach their children. If all parents had a fundamental
> constitutional right to dictate individually what the schools teach their children,
> the schools would be forced to cater a curriculum for each student whose
> parents had genuine moral disagreements with the school's choice of subject
> matter. We cannot see that the Constitution imposes such a burden on state
> educational systems, and accordingly find that the rights of parents as
> described by *Meyer* and *Pierce* do not encompass a broad-based right to
> restrict the flow of information in the public schools.

*Id.* at 533-34 (citations omitted).

The United States Court of Appeals for the Second Circuit reached the same

conclusion in a case filed by a parent seeking to exempt his seventh-grade son from

mandatory attendance in health education class. *Leebaert v. Harrington*, 332 F.3d 134 (2nd

Cir. 2003).  In *Leebaert*, the parent-plaintiff argued that certain materials and discussion in

the health curriculum conflicted with his sincerely held religious beliefs.   The defendant

school board was granted summary judgment.  The Court found that the mandatory health

education class was rationally related to the legitimate goal of educating children regarding

health and, thus, plaintiff's son would not be exempt from the school's attendance

requirements.

In this case, the Court finds that the purpose of the training, to-wit, to address the issue of harassment at school, including harassment based upon actual or perceived sexual orientation, is rationally related to a legitimate educational goal, namely to maintain a safe environment.  As such, the Plaintiffs do not have the right to impede the Board's reasonable pedagogical prerogative, nor do they have the right to opt-out of the same.

Notably, as Intervenor-Defendants point out, Plaintiffs are not requesting that a student absent from the training be considered an "excused"  or that the Board offer an alternate assignment on the issue of diversity.  Rather, they seek to opt-out of the training altogether.  Given the requirements of the Consent Decree,  the Board cannot meet this demand.  Moreover, as there is no burden on Plaintiffs' freedom of speech, free exercise or other constitutional right, there is simply no basis for an opt-out.

**D.    Remaining Claims**

As for the Plaintiffs' remaining claims, they are equally untenable.  There is simply no evidence that the Plaintiffs were denied equal protection under the Board's  policies and practices.

With regard to Plaintiffs' claim for injunctive relief, in order to secure an injunction, Plaintiffs must establish that they have prevailed on the merits and continue to suffer irreparable harm.  Given that the lack of factual support for their claims, Plaintiffs cannot prevail upon the merits.  As such, injunctive relief is not warranted.

**E.    Damages, Costs and Fees**

To date, Plaintiffs have failed to substantiate their claim for damages.   As

14

Defendants point out, even in response to a direct interrogatory, Plaintiffs were unable to specify the measure and amount of their alleged damages. Notably, in in their dispositive motion and reply in support of the same, Plaintiffs refer only to "nominal damages." [Docket Nos. 50 and 62]. However, even their request for nominal damages remains unsupported by any factual allegations.

The only possible basis the Court can discern for any award of damages to Plaintiffs is the limited period of time during which the Board's written policies which were constitutionally suspect. Yet, again, Plaintiffs have made no specific plea.

As for fees, the case law is clear. Absent statutory authorization, a prevailing party will not be awarded fees. *See generally, Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240 (1975). Therefore, Defendants will not be awarded fees. Moreover, as Plaintiffs have not prevailed, any argument on their part for fees is futile.[5]

---

[5] As for the Intervenor-Defendants, any argument they may have in this regard will be considered in *Boyd County High School Gay Straight Alliance, et al. v. Board of Education of Boyd County, et al.* 03-CI-17-DLB.

15

**IV.     CONCLUSION**

Accordingly, **IT IS HEREBY ORDERED** as follows:

(1)     Defendants' Motion for Summary Judgment [Docket No. 48] shall be **SUSTAINED** with regard to Plaintiffs' First Amendment free speech claim as it to pertains to the Fall 2004 student training,  Plaintiffs' First Amendment free exercise claim, Plaintiffs' Fourteenth Amendment parental rights and substantive due process claim, Plaintiffs' Equal Protection claim and Plaintiffs' claim for a permanent injunction,  and **OVERRULED AS MOOT** with respect to Plaintiffs' First Amendment free speech claim regarding the written policies in effect for the 2004-2005 school year;

(2)     Plaintiffs' Motion for Summary Judgment [Docket No. 50] shall be **OVERRULED**; and

(3)     Intervenor-Defendants' Motion for Summary Judgment [Docket No. 49] shall be **OVERRULED** with regard to Plaintiffs' First Amendment free speech claim as it to pertains to the Fall 2004 student training, be **SUSTAINED** with regard to Plaintiffs' First Amendment free exercise claim, Plaintiffs' Fourteenth Amendment parental rights and substantive due process claim, Plaintiffs' Equal Protection claim and Plaintiffs' claim for a permanent injunction, and **OVERRULED AS MOOT** with respect to Plaintiffs' First Amendment free speech claim regarding the written policies in effect for the 2004-2005 school year.

A Judgment will be entered contemporaneously herewith.

16

This 17th day of February, 2006.



Signed By:

_David L. Bunning_

United States District Judge

G:\DATA\ORDERS\AshCivil\05-38-MOO-2-17-06.wpd